# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 39841 (f rev)**

_____

**UNITED STATES**
*Appellee*

**v.**

**Joshua N.F. MOTUS**
Airman First Class (E-3), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 23 September 2021

_____

*Military Judge:* Andrew R. Norton.

*Sentence:* Sentence adjudged on 12 September 2019 by GCM convened at Fort George G. Meade, Maryland. Sentence entered by military judge on 4 October 2019 and reentered on 24 March 2021: Dishonorable discharge, confinement for 2 years, and reduction to E-1.

*For Appellant:* Major Alexander A. Navarro, USAF; Carol A. Thompson, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and ANNEXSTAD *Appellate Military Judges*.

Judge ANNEXSTAD delivered the opinion of the court, in which Chief Judge JOHNSON and Senior Judge KEY joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

ANNEXSTAD, Judge:

This case is before our court for the second time. Previously, our court remanded the case to the Chief Trial Judge, Air Force Trial Judiciary, to resolve a substantial issue with the convening authority's decision memorandum as no action was taken on the adjudged sentence. *United States v. Motus*, No. ACM 39841, 2021 CCA LEXIS 93, at *8 (A.F. Ct. Crim. App. 26 Feb. 2021) (unpub. op.).[1] At that time, we deferred deciding Appellant's five assignments of error: (1) whether the evidence was legally and factually sufficient to support Appellant's convictions for sexual assault and abusive sexual contact against NW; (2) whether the evidence was legally and factually sufficient to support Appellant's conviction for abusive sexual contact against OK; (3) whether Appellant was denied effective assistance of counsel under the Sixth Amendment;[2] (4) whether Appellant made a knowing and voluntary forum choice; and (5) whether Appellant was denied the effective assistance of counsel under the Sixth Amendment when trial defense counsel failed to request relief during clemency.[3]

During the remand, on 22 March 2021, the convening authority took action on the sentence by approving the sentence in its entirety. As a result, on 24 March 2021, the military judge signed a modified entry of judgment (EoJ) pursuant to Rule for Courts-Martial 1111(c)(3).[4] On 26 March 2021, Appellant's record of trial was returned to our court. Appellant submitted no further assignments of error. We find the convening authority's 22 March 2021 action on the sentence complies with applicable law and the modified EoJ correctly reflects the post-trial actions taken in this case.

We combined our review of issues (1) and (2) in this decision, because both concern legal and factual sufficiency. With respect to issues (4) and (5), we have

---

[1] Our remand disposed of part of Appellant's fifth assignment of error, specifically whether trial defense counsel was ineffective for failing to file a post-trial motion after the convening authority failed to take action on Appellant's case. *Motus*, unpub. op. at *2–3.

[2] U.S. CONST. amend. VI.

[3] Appellant's fifth assignment of error was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and included the matter resolved on remand.

[4] References to the punitive articles of the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise noted, all other references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.).

carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). On the remaining issues, we find no error that materially prejudiced Appellant's substantial rights. We affirm the findings and sentence.

# I. BACKGROUND

Appellant was convicted, contrary to his pleas, by a military judge sitting as a general court-martial, of one specification of sexual assault and one specification of abusive sexual contact upon NW, and one specification of abusive sexual contact upon OK.[5] The charged theory of all the offenses was incapable of consent due to impairment by alcohol. We discuss the background of the offenses as related to each victim separately.

## A. Offenses Concerning NW (Charge)

Appellant met NW, a fellow Airman, at Goodfellow Air Force Base (AFB), Texas, where the two were stationed for technical training. Following technical training they were both assigned to Fort Meade, Maryland, and their relationship developed from acquaintances to friends. Appellant and NW would hang out from time to time. In the past, the two had gone "storm chasing" together, been out to eat on multiple occasions, and would often message one another on various messaging applications while at work. By early 2018, Appellant and NW became close friends.

On 2 March 2018, NW got into an argument with her boyfriend of three years, Staff Sergeant (SSgt) CC, and told Appellant about it. SSgt CC was stationed at Davis-Monthan AFB, Arizona. NW often discussed that relationship with Appellant and, on this occasion, told Appellant she felt sad about the argument. On 3 March 2018, NW had arranged to have dinner with Appellant. They arrived at a restaurant sometime after 1500, which was NW's customary mealtime on account of her work schedule. Appellant and NW departed the restaurant sometime after 1700 and returned to NW's apartment to watch a movie and drink whiskey and ginger ale. They arrived at NW's apartment at approximately 1800.

At trial, NW testified that after arriving at her apartment Appellant began mixing the drinks with the alcohol he brought. Appellant was initially pouring one shot of whiskey into each mixed drink, but later started pouring double

---

[5] All three specifications of which Appellant was convicted were violations of Article 120, UCMJ, 10 U.S.C. § 920. The military judge acquitted Appellant of one specification of sexual assault upon OK and two specifications of abusive sexual contact upon NW in violation of Article 120, UCMJ.

shots. NW testified she was "chugging" each of the drinks "in less than a minute." NW consumed somewhere between four to six drinks during the course of the movie. NW further stated that she stopped drinking altogether before the end of the movie. NW "didn't want to drink anymore" because her "limbs were heavy" and she felt like she "couldn't move." She also stated everything was "slow" and that she "couldn't see straight."

NW testified that throughout the movie, Appellant kept moving closer to her on the couch until their legs were touching. NW placed a pillow between her and Appellant because she felt uncomfortable and did not want him to sit so close. NW testified she wanted to text SSgt CC, but Appellant told her not to worry about it because they were trying to have fun watching the movie. NW testified that near the end of movie Appellant asked her what she would do if he kissed her. NW did not say anything in response and felt like she "couldn't move." The next thing she remembered was Appellant leaning towards her and she believes he "kissed her." NW stated that if Appellant kissed her, it was without her consent, as was any other conduct with her that may have happened after that point. NW stated that because of her alcohol consumption that night, her memory of what happened from this point forward was scattered, and that she "just remember[ed] pieces" of events. She later testified she felt like she "blacked out" during portions of the night.

The next memory NW had was Appellant "moving" her and "positioning" her so that she was lying on her back on the long seat of the sectional couch with her legs hanging over the edge. NW testified that as this was happening she did not "feel like [she] could say anything." She further explained, "It didn't feel like anything was working anymore. It felt like I couldn't move my body. It felt like I couldn't say anything. . . . [L]ike I had no choice and that I just know at some point it was like I felt like I gave up." She also described that around this time, Appellant's demeanor changed from "happy and carefree" to "driven." The next thing she remembers is Appellant's hands touching her bare breasts. She remembered them both being naked while they were still in the living room. She described that while Appellant was touching her breasts that she had her arms at her sides and that Appellant was groping her breasts with both of his hands.

The next memory NW described was being on her knees on the floor of the living room, with her back to the couch, Appellant standing in front of her with his "semi-erect" penis in her mouth. She testified that her hands were on his legs and tried to push him away. As this was happening Appellant's hands were holding the back of her head, and he was moving her head back and forth. She indicated that she did not do anything to assist him. She also testified, that at some point Appellant moved his hands to her neck and asked her if she liked to be "choked" because he liked "choking." NW stated that she did not

remember responding to his question, but that Appellant did "choke" her in a "sexual way."

In her next memory NW recalled being on her knees in the bathroom, though she had no recollection of how she got there. She was facing the sink, and Appellant was standing to her right, facing NW. She recalled Appellant holding her hand on his semi-erect penis and that he was moving her hand back and forth on his penis. She testified that she was not freely moving her own hand. NW described that she felt like a "rag doll." She further indicated that she could not move her limbs and felt like she had no control over her body. The next thing she remembered was being naked in the bathtub, with the shower running. Appellant was in the shower with her and was holding her up. She remembered that she started crying and told Appellant to leave. The next thing she could recall was waking up alone in the bathtub, in a few inches of cold water and vomit. She recalled she was crying and felt like she still could not move. She also stated that she felt betrayed, alone, and helpless. She estimated that she sat in the bathtub for approximately 30 to 40 minutes.

At this point NW checked her cell phone and noted that the time was around 2340 to 2350. She stated that she then took a shower to wash off the vomit. After showering, she remembered checking the apartment to make sure that she was alone. She stated that she wanted to make sure Appellant had left. Once she ensured that she was alone she called SSgt CC on the phone and told him what had happened. During trial, SSgt CC described NW's demeanor as "scared," "crying," and "kind of hysterical." During their conversation, NW's phone battery died, disconnecting the call. SSgt CC testified that he tried to call her back, but was unable to reach her, so he called a nonemergency response line in Odenton, Maryland, out of concern for her safety. NW testified that after her phone died, she felt exhausted and fell asleep on the couch. The next thing she recalled was waking up with her front door open and seeing flashing lights. She was still naked and one of paramedics asked her to cover herself, and then asked her if she wanted to go to the hospital. NW stated that she did not want to go to the hospital, and the paramedics subsequently left the apartment.

At this point, NW, testified that she charged her phone and called SSgt CC. They later switched the conversation to a video call, so they could both talk and use the computer at the same time. During their conversation, they decided that NW should report what happened and found the number for the Sexual Assault Prevention and Response (SAPR) victim advocate. After she spoke with the victim advocate, NW drove herself to the hospital to be examined. It was around dawn when she arrived at the hospital. At the hospital, NW underwent a sexual assault forensic examination (SAFE), during which

she had blood drawn for various lab tests. DNA was also collected during the SAFE, which included both vaginal and cervical swabs.

NW eventually reported this incident to the Air Force Office of Special Investigations (AFOSI). As part of the investigation AFOSI agents encouraged NW to text Appellant about the events of 3 March 2018. During the text conversation, Appellant acknowledged that NW performed oral sex on him, and that he had enjoyed performing oral sex on her. Appellant also confirmed that the oral sex that he performed on her was the farthest they went because she got sick and he had to take her to the bathroom. Printouts of their text conversation were admitted at trial as Prosecution Exhibit 2.

Subsequently, AFOSI agents brought Appellant in for questioning. After waiving his right to counsel, Appellant agreed to voluntarily answer questions. Appellant's AFOSI interview was recorded and presented during trial as Prosecution Exhibit 5.

During the interview, Appellant admitted that he and NW went to dinner on 3 March 2018. After dinner Appellant stated that they went back to NW's apartment to drink and watch a movie. Appellant confirmed that they were drinking whiskey and ginger ale, and that he was the one mixing the drinks. Appellant confirmed that he and NW consumed between three and six drinks during the movie and that NW was drunk. Appellant then stated to the agents that NW kissed him and that they had oral sex by him putting his penis in her mouth. Appellant further confirmed to the agents that at the time of oral sex, NW was "drunk," "lethargic," and "not in her right mind." Appellant further admitted that it was "wrong" for him to pick up NW, who was laying drunk on the couch, and move her body to a position so she could perform oral sex on him. Appellant then stated that he "returned the favor" by putting his mouth on her vagina.

As the interview progressed Appellant admitted that during the oral sex exchange, he was standing by the couch, and that he had to move NW closer to him because she was too drunk to move on her own. Appellant confirmed he "dragged" her across the couch by putting his arm under her shoulder to carry her body weight. Appellant also admitted that he took off his own clothes and NW's clothes because she was too drunk to do it herself. Appellant said that while he was performing oral sex on NW, she told him that she needed to go to the bathroom to vomit. Appellant stated no further sexual activity happened after NW vomited. Finally, Appellant told agents that once NW told him to leave, he left and drove home.

At trial, the Government also presented testimony from Mr. JD, a supervisory forensic biologist at the United States Army Criminal Investigative Laboratory (USACIL). Mr. JD was recognized by the court as an expert witness

in the field of forensic biology. Mr. JD testified that he performed DNA analysis on both the swabs collected during the SAFE of NW and buccal swab collected from Appellant. His analysis concluded that male DNA was detected on both the vaginal and cervical swabs of NW and that Appellant could not be excluded from the DNA profile.

**B. Offense Concerning OK (Additional Charge)**

Appellant met OK in May 2018 through mutual friends at work. Like Appellant, OK was a servicemember and worked on Fort Meade. A few months after they met, OK began looking for a new place to live because her current lease was about to expire. She eventually moved into a room in the apartment Appellant shared with another roommate, Petty Officer (PO) SA.

At trial, OK testified about a small party she and her roommates had on 18 November 2018 that began inside their apartment. OK estimated that over the course of about two and a half hours, she consumed one mixed drink containing juice and vodka in a "larger Stein-type glass," two or three beers, and two shots of tequila before the group moved the party to a downstairs common area. OK continued drinking downstairs but could not recall how much she drank or what she was drinking. In time, OK started kissing her friend, PO JH, which prompted Appellant to pull her away and take her upstairs to her room. PO MB, who observed Appellant's actions at the party, testified Appellant seemed upset when he pulled OK away from PO JH. OK remembered stumbling as Appellant was leading her away from the group. It is unclear from her testimony whether she stumbled because of her alcohol consumption or because of how fast Appellant pulled her away, or whether it was a combination of the two. At trial, she characterized her level of intoxication at this point as "surpassed tipsy." The last thing OK remembered was walking down the hallway towards the apartment and Appellant asked her if she knew what she was doing. OK told Appellant "no," she did not, but she could not recall anything else from that night.

The next thing OK remembered was the next morning when she woke up in bed, alone, without her sports bra, but wearing a shirt. Her pants were unbuttoned and unzipped. She discovered she had vomited in a trash can next to her bed, but had no memory of doing so. She also noticed that her menstrual cup had been moved up inside her vagina further than it should have been. OK was shocked to find herself this way, and tried to remember what had happened the night before.

At trial, PO MB, who was drinking with Appellant and OK at the party, testified she first met OK that night and described her as being very intoxicated. Specifically, PO MB testified that she observed OK stumbling while try-

ing to walk and, at one point in the evening, laying drunk on the concrete outside the apartment complex. PO MB also testified that she observed Appellant getting very upset when he saw OK kissing PO JH. She described Appellant's demeanor as irritated and aggressive.

PO AV also testified at trial that he was drinking with the group at both the apartment and later at the common area of the apartment complex. PO AV testified he knew both Appellant and OK before the night of the party. PO AV testified that he did not drink during the latter half of the party, and noted that OK was very drunk—"more drunk" than any other person at the party. PO AV testified that he left the party during the night to drive a friend home. He stated that he was gone from the party for about 30 minutes. When he returned from dropping his friend off, he bypassed the common area and went up to the apartment where Appellant and OK lived. He then stated that he knocked on the door and waited a minute or two before Appellant answered the door. He stated that when Appellant answered the door, he was "very sweaty" in appearance and was acting "nervous." PO AV stated that Appellant then told him, without being asked, that "it was hot in his room" and then "ran away," somewhere in the apartment. PO AV testified that he did not notice that the apartment was warm.

PO AV said he walked into the apartment and that he could hear OK crying in her bedroom. He described that when he walked into her bedroom to check on her, that he found her lying on her bed, crying and babbling. He then sat down next to her and held her while she was crying, and stated that she was so drunk that she was unable to sit up on her own. At this point, PO AV remembered that OK started vomiting and that he and Appellant moved her to the bathroom. After she stopped vomiting, he stated that he tried to get OK to calm down and stop crying. PO AV stated that he was worried about OK, so he and Appellant decided to stay in her room that night with her. PO AV testified that OK was not "coherent enough" to remove her own clothes that night.

Because her last memory of the evening was with Appellant, OK sent him a text to help her remember what happened. OK explained to Appellant that she woke up without her sports bra and that her pants were unbuttoned and unzipped. Appellant made a joke that it might have been a ghost, but did not provide answers that satisfied OK's concern. Later, OK again confronted Appellant via text message seeking details of what happened. The following exchange of texts[6] ensued and was admitted at trial as Prosecution Exhibit 13:

---

[6] Unless otherwise marked, texts quoted in the opinion are presented verbatim without correction.

[OK:] So I'm sorry if things were weird last night I just have to address something and I'm not good at handling confrontation, so I'm sorry for doing this over text. Because there are just a lot of questionable circumstances about that night. I know you said nothing happened, but there is a lot that just doesn't make sense. I woke up with no bra on…a sports bra…and my pants unbuttoned and unzipped…like that's just not something I do when I'm drunk…especially take my bra off and put my shirt back on…it doesn't add up. And when I asked [PO AV][7] why I had no bra on he asked me later that day why I asked him and I said I just thought it was weird and a lot of that night is hazy but he mentioned that when he came to the apartment you were oddly sweaty. And when he saw me I was crying and when he asked me why I didn't say anything. I'm sorry for not bringing it up sooner, but I really just feel uneasy about all of it and I didn't know what to say.

[Appellant:] Can you please believe me when I say nothing happened, so you were making out with [PO JH] and that's when I knew I had to stop the party and take you upstairs, going to the elevator you were so drunk so I took you to ur room and then we got frisky an whatnot but I know I couldn't do it so I put ur shirt back on and then tried buttoning ur pants back on [sic] but you were so drunk and I couldn't do it but I was trying at that point I'm getting nervous now because [PO AV] might think we did it hence why I was sweaty and the fact that I never got to button ur pants on. Then I decided not to say anything cause that was just an embarrassing moment. Til you brought it up yesterday and I was gonna tell you in person when you get back but by the time ur back I knocked out[.]

Yes it looks bad but believe me when I say nothing happened. You're family to me and I would never do anything stupid[.]

[OK:] So when I was making out with [PO JH,] you knew you had to end the party because I was so drunk, but you thought I was sober enough for you to do the same with you.

[Appellant:] The alcohol in me said go but I knew that it's not right that's why I stopped, we were kissing but had to stop abruptly before it goes bad[.]

---

[7] PO AV was a friend of both Appellant and OK and was at the party.

[OK:] It went bad the second you didn't shut the door and leave me alone in my room.

[Appellant:] That's why [I] stopped. I really apologize for not saying anything sooner I was just too embarrassed[.]

I understand that you're mad but please believe me when [I] say that nothing really happened other than kissing.

[OK:] My bra was off and my pants were undone. If it didn't happen you were trying.

I am staying at barracks with [PO AV] tonight.

[Appellant:] Good night, can we please talk about this in person in the future.

[OK:] There isn't much else to say.

[Appellant:] I know I messed up and this is embarrassing. But [I] stopped I really did, you're one of my closest friends and I messed up big time. You probably will not forgive me but please do, in the meantime I'll leave you alone just know that if you ever need anything I'm still here for ya[.]

[OK:] I'm just upset because I know you aren't being honest with me. My [menstrual] cup was way higher that it should have been because I checked that morning right after I woke up.

[Appellant:] Please believe me when I say that I told you everything that I knew what [sic] happened that night and I swear on [ ]'s life that all [I] remembered on that night where we kissed and nothing else happened. I know it's a dumb mistake on my part and I know that you're upset but believe me when I say that I told you everything I know that happened[.]

[OK]: You literally had so many chances to tell me what happened and I even asked you to your face and you lied to me so I have no reason to believe you when you say nothing else happened.

Like my pants were completely undone and my [menstrual] cup was in a different place that doesn't just happen[.]

[Appellant]: Yes, I had so many chances but [t]o be honest I was so embarrassed of what I did, and I was scared of losing this friendship over a dumb drunk mistake.

The reason I tried avoiding the question was because I do not want to lose you and obviously that was a dumb mistake that I regret and will never forgive myself.

Yes your pants were undone and yes your shirt were off but as far as the [menstrual] cup I did not do anything else. It may seem like I am lying and I deserve that for holding out this info but what I'm telling now is the truth. I literally gave all my alcohol away to [ ] because I couldn't not stand myself being drunk again and do the stupidest mistake that cost a very rare and genuine friendship.

And I know that I probably deserve losing you as my best friend for what I did and I just want you to know that not a day goes by that I'm not disgusted with myself[.]

I'm not perfect I have flaws but that doesn't mean that what I did was forgivable, and I'm really really sorry[.]

[OK:] So how were my pants and shirt and bra off if we "only kissed".

And explain how you thought I was too drunk to kiss [PO JH], but not too drunk to do that and more with you. Like at what point between that and walking to my room was I suddenly able to make that decision.

[Appellant:] [OK,] I already told you we only kissed. Yes your shirt and bra was off and then pants were unzipped but before anything got stupidly dumb I stopped[.] As far as an explanation I don't know what possessed me to do such a horrible mistake, I shouldn't have drank liquor and I should've paced myself better with alcohol. I regretted it I regretted everything, I am ashamed and I hate myself for ruining a perfect friendship[.]

[OK:] So when you took my shirt bra and pants off your goal was to just kiss me?

[Appellant:] No it wasn't, and it's not me as a person to do so. I stopped after realizing the lapse of judgement and that's when I started panicking and tried putting back everything before [PO AV] and the others would assume something happened[.]

[OK:] How are you going to sit there and say that taking my shirt off, my bra off, and my pants off was a lack of judgement.

[Appellant:] I know I made a mistake, it may be bad wording but what I meant to say was it's not normal of me to be reckless like

that and I realized my stupidity and that's when I tried undoing the mistakes[.]

I should have told you the day after but I was just super embarrassed[.]

[OK:] You asked me in the hallway if I knew what I was doing and I told you no.

[Appellant:] I did. And I made a mistake and I will never forgive myself ever[.]

## II. DISCUSSION

## A. Legal and Factual Sufficiency

On appeal, Appellant contends that the evidence supporting his conviction of sexual assault and abusive sexual contact upon NW (Specifications 1 and 2 of the Charge) and the evidence supporting his conviction of abusive sexual contact upon OK (Specification 2 of the Additional Charge) are legally and factually insufficient. We disagree.

### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to

'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citation omitted), *aff'd*, 78 M.J. 218 (C.A.A.F. 2018) (quoting *Washington*, 57 M.J. at 399).

### 2. Analysis

Regarding the offenses concerning NW, Appellant contends there was insufficient evidence to show either that she was incapable of consenting or that he knew her level of intoxication. Additionally, Appellant contends that NW had a motive to fabricate the assault and that there was a reasonable alternative other than guilt. Regarding the offense concerning OK, Appellant contends that the evidence was insufficient to show that OK was incapable of consenting and also that there was a reasonable alternative other than guilt. We disagree with Appellant's contentions and find Appellant's conviction for these offenses both legally and factually sufficient.

We examine the offenses involving NW and OK, in turn.

#### a. Offenses Involving NW

Appellant's conviction for sexual assault on NW in violation of Article 120, UCMJ, required the Government to prove beyond a reasonable doubt: (1) on or about 3 March 2018, Appellant committed a sexual act upon NW, to wit: penetrating her mouth with his penis; (2) Appellant did so when NW was incapable of consenting to the sexual act due to impairment by alcohol; and (3) Appellant knew or reasonably should have known NW was incapable of consenting to the sexual act due to impairment by alcohol. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(3)(f).

Additionally, Appellant's conviction for abusive sexual contact on NW in violation of Article 120, UCMJ, required the Government to prove: (1) on or about 3 March 2018, Appellant committed a sexual contact upon NW, to wit: touching her genitalia with his tongue, with intent to gratify his sexual desire; (2) Appellant did so when NW was incapable of consenting to the sexual contact due to impairment by alcohol; and (3) Appellant knew or reasonably should have known NW was incapable of consenting to the sexual contact due to impairment by alcohol. *See MCM*, pt. IV, ¶ 45.b.(7)(f).

"The term 'consent' means a freely given agreement to the conduct at issue by a competent person." 10 U.S.C. § 920(g)(8)(A). A person is incapable of consenting if she lacks the cognitive ability to appreciate the sexual conduct in question or lacks the physical or mental ability to make or to communicate a decision about whether she agrees to the conduct. *See United States v. Pease*, 75 M.J. 180, 185–86 (C.A.A.F. 2016) (citation omitted). "A person can be awake and conscious and still be incapable of consenting." *United States v. Bailey*, 77

M.J. 11, 14 (C.A.A.F. 2017) (citation omitted). A person can also possess some ability to communicate and still be incapable of consenting. *See id.* at 14–15.

We note at the outset that Appellant did not at trial, and does not now on appeal, contest that the sexual acts occurred. We find that there was ample evidence to support the conclusion that Appellant both put his penis inside NW's mouth and that he touched NW's vagina with his tongue. Most of the litigation, at trial and now on appeal, concerns whether the Government proved that NW was incapable of consenting to the sexual acts due to her impairment by alcohol and whether Appellant knew or should have known of her condition. We find that a rational trier of fact could find these elements proven beyond a reasonable doubt. Several considerations lead us to this conclusion.

First, NW testified that she consumed four to six mixed drinks containing whiskey and ginger ale in about a two-hour period. The testimony revealed that a majority of these drinks contained double shots of whiskey and that Appellant was the one pouring the drinks. NW described that she consumed these drinks quickly, finishing each in about a minute. NW also testified that she stopped drinking before the end of the movie because she was already feeling the effects of the alcohol. She testified her "limbs were heavy," and she felt like she was "trapped" and "couldn't move." She also described not being able to "see straight." Furthermore, she testified she could only "remember pieces" of the events of the night. She testified she eventually vomited in her bathroom and shower because of the amount of alcohol she consumed. Finally, NW described waking up in her bathtub in a few inches of cold water and vomit. She said that she still could not move at this point, and she stayed in the shower for another 30–45 minutes before she rinsed herself off. The military judge observed NW's testimony and evidently found her credible. We do as well.

Second, Appellant's own statements speak to both NW's level of intoxication and that her impairment was obvious to him. During his AFOSI interview, Appellant described NW as "drunk," "lethargic," and "not in her right mind." He described to AFOSI that he had to physically move her closer to him so that he could put his penis in her mouth because she was too drunk to move herself. Appellant confirmed that he "dragged" her across the couch by putting his arm under her shoulder to carry her weight. Appellant also admitted that he took off his own clothes, and disrobed NW because she was too drunk to do it herself. Appellant explained that while he was performing oral sex on NW, she told him she needed to go to the bathroom to vomit, and that he had to physically help her to the bathroom and later that he had to physically hold her up in the shower. We note that Appellant's own statements are consistent with much of NW's testimony and the DNA evidence that was presented at trial.

The law does not require complete incapacitation to the point of non-responsiveness, as Appellant seems to argue. *See Bailey*, 77 M.J. at 14. The facts

as described above regarding NW's level of impairment, along with her testimony regarding her confusion and her lack of ability to move and communicate during the sexual acts provide sufficient evidence that she was incapable of consenting. Furthermore, Appellant's own statements detail that her level of intoxication and impairment would have been obvious to him, and provide compelling evidence that he knew or reasonably should have known her condition and her inability to consent.

We are also not persuaded, as Appellant contends, that NW had a motive to fabricate and that there is another reasonable explanation for what occurred: that NW was interested in Appellant and lied about what happened to cover up that she cheated on her boyfriend, SSgt CC. On this record, we find no good cause to question NW's veracity, and find sufficient facts to support NW's level of intoxication and her description of what she remembers. Additionally, NW's behavior during and immediately after the offense corroborates her testimony about her level of intoxication and the events that occurred that night. Moreover, her behavior lends no support to the idea that she lied about how much she drank in order to avoid the allegation that she had been unfaithful. We see no persuasive evidence that NW was interested in Appellant, or that she was flirting with Appellant. To the contrary, NW testified how she placed a pillow between her and Appellant during the movie and how he made her feel "uncomfortable." She also described his demeanor changing from "happy go lucky" to "driven" after he kissed her. We also find that Appellant's own words make his alternative explanation unreasonable. Appellant described to AFOSI agents how he had to drag NW across the couch to engage in sexual acts because she was "drunk" and how she was unable to move her own body. The evidence does not support Appellant's alternate explanation.

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude that a rational factfinder could have found that all the essential elements were met, and that the Government disproved any mistake of fact beyond a reasonable doubt. We therefore conclude the evidence was legally sufficient to support Appellant's conviction for sexual assault and abusive sexual contact. Additionally, after taking a fresh, impartial look at the evidence and applying neither a presumption of innocence nor a presumption of guilt and after having made allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

### b. Offense Involving OK

Appellant's conviction for abusive sexual contact on OK in violation of Article 120, UCMJ, required the Government to prove: (1) on or about 18 November 2018, Appellant committed sexual contact upon OK, to wit: touching her body with his hands, with the intent to gratify his sexual desire; (2) Appellant

did so when OK was incapable of consenting to the sexual contact due to impairment by alcohol; and (3) Appellant knew or reasonably should have known OK was incapable of consenting to the sexual contact due to impairment by alcohol. *See MCM*, pt. IV, ¶ 45.b.(7)(f).

Appellant again argues the evidence was insufficient to show that OK was incapable of consenting due to the amount of alcohol she consumed. Additionally, Appellant argues that a reasonable explanation exists other than guilt. We find that a rational trier of fact could find these elements proven beyond a reasonable doubt. Again, several considerations lead us to this conclusion.

First, OK's testimony indicated that she was substantially impaired by alcohol at the time of the offense. OK testified that on the night in question, she and Appellant had a party at their apartment. She testified that over the course of two to three hours she consumed two shots of tequila, one mixed drink in a "large Stein-type" glass, and two to three beers. Eventually, she explained that the party moved to a downstairs common area where she continued to drink alcohol, but could not recall what and how much she drank. She testified that at some point she remembered kissing PO JH, and that Appellant came and pulled her away to take her upstairs to her bedroom. OK described that at that point she was beyond "tipsy." OK also testified that she remembered stumbling as Appellant led her to her room. OK also stated that one of her last memories of the evening was Appellant asking her if she knew what she was doing and that she responded "no." She had no memory of anything from that point on.

Second, we consider the testimony of two of the witnesses called during Appellant's trial. PO MB, who did not know OK before that night, described OK as very intoxicated. PO MB described at one point that she saw OK lying on the sidewalk outside the apartment complex and walking drunkenly around the party. PO AV also testified that OK was heavily intoxicated; in fact, he testified that she was "more drunk than anyone else at the party." PO AV explained that after he gave a friend a ride home that he returned to the apartment where Appellant and OK lived, and that when Appellant answered the door, he was sweaty and acting nervous. He testified that after entering the apartment he heard OK crying and babbling in her room. He described her at this point as being unable to sit up on her own. PO AV then stated that OK began to vomit, and that he and Appellant had to help her to the bathroom. Finally, PO AV testified that OK was in no condition to remove her own clothes and because of his concern for her, he and Appellant stayed with her that night in her room.

Third, we consider Prosecution Exhibit 13, which contained the text messages between OK and Appellant the day after the party. In this string of text messages, Appellant admits numerous times that OK was "drunk." He also

acknowledges that he considered her too drunk to be kissing PO JH and that he took her upstairs. He also confirmed that OK told him she did not know what she was doing. Appellant also admitted that the "alcohol in [him] said go" when he and OK were kissing in her bedroom. He further admitted that he undressed her by removing her shirt, bra, and unbuttoning her pants. He acknowledged wanting to do more but stopped because he "knew that [it was] not right." He explained that after he realized he was making a "dumb mistake," he panicked and put her clothes back on before PO AV arrived back at their apartment.

We find the facts as presented at trial provide a sufficient basis for a rational trier of fact to conclude that the Government proved all the essential elements of abusive sexual contact beyond a reasonable doubt. Appellant admitted that he touched OK's body, removed her shirt and bra and unbuttoned her pants while he was kissing her. Appellant further admitted that he was aroused and wanted to go further. Additionally, we find that the evidence described above regarding OK's level of impairment provides sufficient proof for a factfinder to conclude that OK lacked the cognitive ability to appreciate the sexual conduct and therefore was incapable of consenting to the sexual activity. Furthermore, Appellant's own admissions in the text string regarding OK's level of intoxication and impairment provides compelling evidence that he knew or reasonably should have known her condition and did not have a reasonable mistake of fact as to her ability to consent. Furthermore, Appellant's actions re-dressing OK, appearing sweaty and nervous when PO AV arrived at the apartment, and initially denying that anything happened in the text message exchange with OK provided some evidence of Appellant's guilty conscience.

Appellant contends on appeal that there is a reasonable alternative explanation other than guilt in this case. Specifically, Appellant contends that OK had lowered inhibitions after consuming alcohol and that she was the one who pursued sexual activity with him. Again, the evidence does not support such a theory. There is no evidence indicating that OK was interested in, or flirting with Appellant. In fact, the evidence shows that she was upset with Appellant for taking advantage of her and she confronted him about it. At no point during his text exchange with OK did Appellant indicate that she initiated the sexual activity. Appellant repeatedly apologized to OK and stated that he made a mistake and was embarrassed and tried to cover up his actions.

Drawing every reasonable inference from the evidence of record in favor of the Government, a reasonable factfinder could have found all the essential elements were met, and that the Government disproved any mistake of fact beyond a reasonable doubt. Additionally, after taking a fresh, impartial look at

the evidence and applying neither a presumption of innocence nor a presumption of guilt and after having made allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

## B. Claims of Ineffective Assistance of Counsel

### 1. Additional Background

Appellant asserts trial defense counsel were ineffective when they: (1) declined to give an opening statement; (2) failed to interview OK before trial; (3) failed to adequately cross-examine NW and OK; and (4) failed to question or challenge the military judge or to properly advise Appellant on his forum choice. He further asserts the cumulative impact of their deficient performance affected the outcome of the trial.

On 30 December 2020, we granted Appellant's motion to attach a declaration by Appellant that supports this assignment of error. On 4 January 2021 and 6 January 2021, our court ordered Appellant's three trial defense counsel, Mr. NF, Major (Maj) ES,[8] and Captain (Capt) LG, to provide responsive declarations.[9] We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's assertions and his trial defense team's assertions. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). We find a hearing unnecessary to resolve Appellant's claims.

One of Appellant's trial defense counsel, Mr. NF, described in detail the defense strategy they undertook in this case. Mr. NF explained it was driven and very limited by the fact that there were two victims who were accusing Appellant of very similar offenses. He stated the Defense was further limited by the lengthy admissions Appellant made to AFOSI, NW, and OK. Mr. NF provided their strategy was to center the defense on technical arguments. Specifically, his stated goals for the offenses against NW were to show that she was not incapacitated beyond consent and to challenge whether Appellant knew or reasonably should have known that she was incapacitated. He also stated the strategy for OK was to challenge the burden of proof for the specification alleging Appellant sexually assaulted her by penetrating her vagina and

---

[8] Maj ES was a captain at the time of trial.

[9] The military judge advised Appellant about his right to counsel. At arraignment, Appellant affirmed he wished to be represented by Mr. NF and Maj ES. However, a conflict was identified that precluded Maj ES from continuing the representation, and Maj ES was released from the representation and replaced by Capt LG. Appellant was represented by Mr. NF and Capt LG during trial on the merits.

to try to have the abusive sexual contact charge dismissed for lack of specificity. Mr. NF stated that it was his recommendation that these technical strategies had a better chance of success in a judge-alone trial, and that he had been successful in employing this strategy in previous trials. Capt LG also provided in his declaration that the Government's charging theory of incapacitation opened the door to "solid legal argument[s]" and a strategy that accepted everything each victim said as true but left open the ability for the Defense to argue Appellant's innocence as a matter of law.

### 2. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id.* (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

The United States Supreme Court has defined the prejudice element of an ineffective assistance of counsel claim as

> focus[ing] on the question whether counsel's performance renders the result of the trial unreliable or the proceedings fundamentally unfair. Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of a substantive or procedural right to which the law entitles him.

*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citations omitted).

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Datavs*, 71 M.J. at 424 (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted). In reviewing the decisions and actions of trial defense counsel, this court does not second-guess "reasonable strategic or tactical decisions." *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted).

### 3. Analysis

We find each claimed allegation of ineffective assistance of counsel meritless.

### a. Declining to Give an Opening Statement

Appellant's first contention is that his trial defense counsel were ineffective by declining to give an opening statement either before the Government's case-in-chief or prior to the Defense's case-in chief. Appellant generally argues that he was prejudiced because his counsel failed to advance a defense theme and theory of the case for the expected evidence.

Two of Appellant's trial defense counsel, Mr. NF and Capt LG, provided declarations on this issue. Mr. NF explained that in his experience, opening statements were not helpful in judge-alone trials because in his opinion they only serve to "tip the [G]overnment off to your strategy." Capt LG elaborated on this point in his declaration and explained that based on the evidence, they suspected the Government was going to present a case under the irrelevant "theory of lack of consent by bodily harm, instead of how the case was charged." Capt LG further provided that their suspicion was based on the questions that they were aware the Government had asked witnesses and the Government's opening statement. As such, Capt LG explained that they first elected to reserve opening statement and that throughout the Government's case, the Government confirmed their suspicion. Capt LG stated that at the close of the Government's case they strategically elected to waive their opening statement, because they "did not want to preview [their] theory of the case until [their] closing argument in order to minimize the time trial counsel had to adapt his own argument."

We find Appellant has failed to meet his burden of showing deficient performance. The declarations submitted by trial defense counsel indicate that Mr. NF and Capt LG made reasonable strategic decisions in first reserving their opening statement and later in waiving their opening statement in order to give Appellant a tactical advantage. We do not second guess reasonable strategic or tactical decisions by defense counsel. There are reasonable explanations for trial defense counsel's actions and advice, and their individual and

combined level of advocacy on Appellant's behalf was not "measurably below" the standard of performance. *See Polk*, 32 M.J. at 153 (citation omitted).

### b. Failure to Interview OK

Appellant next argues that the record "strongly suggests" trial defense counsel failed to interview OK prior to trial and this demonstrates they did not properly investigate Appellant's case. Both Mr. NF and Capt LG provided a response on this issue. Capt LG explained that "prior to trial, defense interviewed all witnesses in the case except [ ] OK, who denied our request for interview through counsel on 25 July 2019." Capt LG also provided documentation of the Defense's written request to interview OK and her subsequent refusal. Capt LG further stated that OK also "denied [another] request for interview just prior to the court-martial." Mr. NF confirmed in his declaration that the Defense requested to interview OK on two occasions prior to trial, and that OK refused to interview with the defense team. Mr. NF also provided documentation of one of the written requests and OK's subsequent denial.

We note that Appellant's trial defense counsel had no mechanism to compel an interview of OK. Thus, while technically his counsel "failed to interview" OK, they did make multiple requests to that end, and as such Appellant has failed to overcome the presumption of competence. For these reasons we conclude that Appellant has not met his burden to demonstrate deficient performance for failing to interview OK.

### c. Failure to Effectively Cross-Examine the Victims

Appellant first contends that his trial defense counsel's failure to interview OK resulted in an almost non-existent cross-examination of OK. Appellant argues that this allowed the Government to elicit testimony from OK without any resistance from the Defense. Appellant also alleges ineffective cross-examination of NW because his counsel did not elicit NW's motive to fabricate or challenge her credibility.

Mr. NF addressed each of these allegations in his declaration. He provided that the cross-examination of OK was very limited because she did not remember anything about the alleged sexual assault. He further stated that based on the defense strategy and her lack of memory, he was cautious because he did not want her to start recalling details based on his questions, which might have made matters worse for Appellant. Mr. NF opined that this strategy was partially effective because Appellant was acquitted of sexually assaulting OK. In regards to the allegations concerning NW, Mr. NF declared that all questions during the cross-examination of NW were centered on her incapacitation, which was a defense strategy. Mr. NF again opined that this strategy was effective in that Appellant was acquitted on two of the offenses related to NW, and only convicted of those to which Appellant personally confessed at AFOSI.

Capt LG confirmed in his declaration that the cross-examination of both OK and NW were limited to elicit facts consistent with the Defense's theory. In his opinion, eliciting information on motive to fabricate did not fit the defense theory, and asking additional questions "risked eliciting testimony unfavorable to [Appellant]'s case."

Again we find that Appellant has failed to meet his burden of showing deficient performance. The declarations submitted by trial defense counsel indicate that Mr. NF and Capt LG made reasonable strategic decisions to limit the cross-examinations of NW and OK to support the defense strategy. This strategy was effective in part, as Appellant was acquitted of half of the offenses with which he was charged. We will not second guess reasonable tactical decisions and we are not persuaded that their individual and combined level of advocacy on Appellant's behalf was "measurably below" the standard of performance. *See id.*

### d. Forum Choice

Appellant correctly notes that at his arraignment, the military judge disclosed on the record that the military judge's wife, an active duty judge advocate, was at the time of trial "assigned to the government trial and appellate division as the chief of policy and training for the special victims' unit." Appellant now alleges that his trial defense counsel should have questioned the military judge regarding his wife's position. Specifically, Appellant argues that trial defense counsel were deficient in not asking whether the military judge "would feel any pressure to rule a certain way or if he felt like he would be unable to acquit [Appellant], given his marriage to a sexual assault prosecutor." Appellant also alleges that his counsel erred in advising him on his forum selection. Specifically, Appellant alleges on appeal that he did not understand that the military judge's disclosure meant that he was married to a "sexual assault prosecutor" and that his confusion denied Appellant the ability to "make an informed or voluntary forum choice."

In his declaration to this court, Mr. NF explained that his recommendation to "go judge alone" was based on the fact that the defense strategy was technical. Mr. NF stated that he discussed this strategy with Appellant and advised him that their strategy stood a better chance of success with a military judge as opposed to a panel of members. Similarly, Capt LG noted in his declaration that he had extensive email and in-person discussions with Appellant on his forum choice. Capt LG's declaration supports Mr. NF's declaration as to why they recommended Appellant elect to be tried by military judge alone, stating "there were two independent complaining witnesses alleging sexual assaults with similar predicate facts." Capt LG stated that he explained this to Appellant, and Appellant agreed that he understood the rationale for the recommendation and agreed to elect a military judge forum.

Additionally, Mr. NF declared that he did explain to Appellant that the military judge was married to another judge advocate in a prosecutor function. He stated that he explained that this was not unusual and would not be a successful grounds for challenge. Mr. NF also told Appellant that the defense team had solicited information regarding this particular judge and that the judge had a favorable reputation, and that if they challenged him they could end up with a less favorable judge. Mr. NF stated that he did not question the military judge because he understood lawyer-to-lawyer marriages were common in the military, and he had no reason to believe it would affect the military judge's decision making. Furthermore, Mr. NF declared that there was no "indication that the judge's wife was ever a party to the case, involved in the case or could gain anything from the outcome of the case."

Capt LG echoed this sentiment and noted they did not question the military judge because they did not believe it was in Appellant's best interest to challenge the military judge or to replace him. Maj ES declared, prior to her release, that she also discussed the specific military judge with Mr. NF. Maj ES stated that in the course of her representation of Appellant, that she contacted other defense counsel to find out the military judge's reputation, and learned that the assigned military judge had a positive reputation in the trial defense community and was generally "fair and deliberate in his rulings." Maj ES provided that the decision not to challenge the military judge regarding his wife's assignment was strategic in light of his reputation, explaining, "[h]is spouse's duty position was irrelevant to his ability to fairly perform his duties as a military judge."

At trial, Appellant submitted a written request to be tried by military judge alone. This written request is part of the appellate documents contained in the record. Appellant confirmed to the military judge that he signed the request and had an opportunity to consult fully with his trial defense counsel before he signed the request. Appellant also confirmed that at the time he signed the document he knew who had been detailed as the military judge in his case and that he desired to be tried by military judge alone.

We find reasonable strategic and tactical reasons why trial defense counsel did not question the military judge and why they provided the advice they did regarding forum selection. We evaluate trial defense counsel's performance not by the success of their strategy, "but rather whether counsel made . . . objectively reasonable choice[s] in strategy from the alternatives available at the [trial]." *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (citation omitted). All three members of Appellant's trial defense team investigated the specific military judge's reputation and provided advice to Appellant that opting for this military judge as the trier of fact provided him with the best chance

of success at trial. Accordingly, Appellant has not met his burden to demonstrate deficient performance in this respect.

### e. Cumulative Error

Finally, Appellant argues the cumulative effect of his trial defense counsel's deficient representation negatively affected almost every aspect of the trial. We disagree and find Appellant has not demonstrated their representation was deficient in any aspect. The record as a whole shows Appellant's counsel engaged in extensive pretrial preparation, subpoenaed information, filed multiple motions, requested and received a bill of particulars, requested and presented testimony of two expert witnesses, and competently litigated many issues in the case. The record also details reasonable strategic reasons for the strategy they chose and the advice they provided to Appellant. We find the level of advocacy on Appellant's behalf was not "measurably below the performance . . . [ordinarily expected] of fallible lawyers." *See Polk*, 32 M.J. at 153 (omission and alteration in original) (citation omitted).

## III. CONCLUSION

The findings and sentence entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court